## QUADRANGLE CLUB v. UNITED STATES.
### No. 4866.

Circuit Court of Appeals, Seventh Circuit.
March 24, 1933.

Richard S. Folsom, of Chicago, Ill., and John F. McCarron, of Washington, D. C., for appellant.

Dwight H. Green and John Potts Barnes, both of Chicago, Ill., for the United States.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellant sued to recover taxes collected on the dues of its members. Trial was by the court, and judgment went for appellee.

The section of the Revenue Act (See 26 USCA § 872) whereunder the tax was levied specifies that there shall be paid a tax of ten per cent. of any amount paid "as dues or membership fees to any social, athletic, or sporting club or organization * * *." The applicable Treasury Regulation is: "Any organization which maintains quarters or arranges periodical dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse, is a 'social * * * club or organization' within the meaning of the Act, unless its social features are not a material purpose of the organization but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as, for example, religion, the arts, or business. The tax does not attach to dues or fees of a religious organization, * * * chamber of commerce, commercial club, trade organization, or the like, merely because it has incidental social features, but, if the social features are a material purpose of the organization, then it is a 'social * * * club or organization' within the meaning of the Act."

Whether or not the social features of this club are "a material purpose of the organization," or are merely subordinate and incidental to a predominant purpose, must determine this appeal.

The club was chartered in 1895, for the object stated in the application of "the association of members of the Faculties of the University of Chicago and other persons interested in literature, science, or art, for the purpose of mutual improvement and social recreation * * *." Provision was made for six classes of membership: "Life, active, associate, non-resident, alumni, and quarterly" members. Active membership was limited to selected members of the faculties of the University of Chicago, and these only were entitled to vote and to hold office, except that certain life members, limited in number, might have the privileges of active members; but all classes of members are entitled to the club privileges. The initiation fee for active members is $50, and the annual dues are $40. There are differing rates for the other classes of membership.

The club was located with convenient access to the University buildings. In 1916 the club deeded its club property to the University, and the University agreed to and did expend $100,000 in the erection of a new clubhouse on University property, which was leased to the club for one hundred years at one dollar per annum, with heat and hot water to be supplied at cost by the University.

The building there so constructed by the University and occupied by the club is a three-storied brick structure, containing a card room, billiard room (having six tables), library, writing room, chess room, sun porch, a main and a private dining room, stage, kitchen, help's dining room, seventeen bed rooms, linen room, trunk room, offices, employees' bed rooms, store rooms, toilets, two lounges and dressing rooms, and gymnasium. There are also tennis courts on the premises for use of members.

Men eminent in their profession and high in the University faculty testified that the club was but an adjunct of the University, intended to supply a convenient and appropriate meeting place, primarily for the faculty members, who might there come together and discuss their problems while dining or lunching; and that every day there were such meetings of various groups in the faculty, and that the convenience of access of the club and its facilities enabled them to economize in time by dining or lunching at the same time that they conferred over their University problems. They testified that the social features of the club were merely incidental to this main purpose.

It is readily conceivable that the club, thus situated in the immediate vicinity of the University buildings, affords those conveniences and opportunities as was testified, and that the faculty members frequently availed themselves thereof. But all this does not negative the conclusion that the social features of the club may be a co-ordinate or even its predominating feature.

The fact alone that persons habitually gather at clubs to talk over business affairs does not minimize the relative importance of the club's social activities, nor relegate to insignificance the social features as an effective influence in drawing together persons who may there "over the teacups" discuss their common problems. Whether the persons who thus come together be of different professions or callings, or be largely of the same, or whether they are affiliated with the same or different institutions, is not necessarily material, provided the usual club structure is present, with its members paying dues as in clubs generally.

Membership in the faculty does not of itself entitle one to club membership; club membership is selective, depending on election, as in most clubs. Frequency of attendance by nonmembers is limited by the by-laws,

but interest in University problems is presumably not limited to the club member part of the faculty; and so it is conceivable that at times there might be embarrassment amounting to impracticability in holding such meetings at this private club.

If the only purpose of the club were to serve as a place for considering University problems while lunching or dining, a mere dining room with kitchen attachment would likely suffice. But such a place would not be likely to attract many patrons. Here we have the complete layout of the ordinary social club, as the above specification would indicate, all for the delectation and comfort of the members, their families, and their guests.

Several of the membership classifications are not even necessarily connected with the University faculty, and their connection with the club would no doubt be largely, if not entirely, social.

That this club, with its approximately eight hundred members, was not intended to be merely or mainly an intellectual workshop or clearing house for the University faculties, is persuasively suggested by one of the club by-laws, which prescribes: "The public rooms of the Club House shall not be habitually used by members for the transaction of business or as a place for work or study."

The evidence of the specific social activities of the club during the period in question is strongly indicative that the social features are not merely incidental. One of the by-laws makes provision for a committee on "Entertainment and Games," and each season the committee publishes a list of affairs to be given. Of these there were quite a number each month of such nature as dances, afternoon and Sunday teas, smokers, billiard and bridge tournaments, bridge nights, Christmas revels, children's parties, and ladies' nights—not to mention numerous lectures, talks, and concerts, which were in the main not less entertaining than cultural.

The club seems to have assumed its social status by paying the tax without protest from 1920 until 1929, when demand for refund was first made to the Commissioner. For most of the years demanded the statute of limitations had run, thereby reducing the claim from about $20,000, as filed, to about $9,000, which is now involved.

We considered circumstances quite similar in Fleming v. Reinecke, 52 F.(2d) 449, 80 A. L. R. 1293, reaching the conclusion that the Traffic Club of Chicago was taxable as a social club.

Peculiarly here applicable is the following quotation from Faculty Club of the University of California v. United States, 65 Ct. Cl. 754: "While this club undoubtedly serves an important administrative use by members of the faculty and officers of the university, and furnishes a medium for a wide range of academic activities, it is not an essential adjunct to the university. It is shown in the evidence that all the work now performed in the club could be done without such a club. However, a social club of this nature must unquestionably have a very definite value in the promotion of the general welfare of this great university. To hold that 'its social features are not a material purpose of the organization,' or that its purposes and activities are 'merely incidental to the active furtherance of a different and predominant purpose,' would be contrary to the declared purposes of its organization and to the usual and customary social activities of the club throughout the twenty-six years of its existence. The court has reached the conclusion that the Faculty Club of the University of California is a social club within the meaning of the taxing statutes."

We conclude that the District Court correctly decided the case, and its judgment is affirmed.